UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

LEO HUNTER,

     Petitioner,

v.

JOHN HENLEY,[1] et al.,

     Respondents.

Case No. 3:18-cv-00166-HDM-CLB

**ORDER DENYING AMENDED 28 U.S.C. § 2254 PETITION AND CLOSING CASE**

**[ECF No. 40]**

Petitioner Leo Hunter, a Nevada prisoner, has filed a counseled Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 40 ("Petition").) This matter is before this Court for adjudication of the merits of the remaining grounds in the Petition,[2] which allege that his trial counsel failed to impeach a witness and prepare for sentencing. (*Id.*) For the reasons discussed below, this Court denies the Petition.

**I. BACKGROUND**

  **A. Factual background**[3]

Stella Hunter (hereinafter "Stella"), Hunter's estranged wife, testified that she moved from Panama City, Florida to Humboldt County, Nevada with Hunter, her daughter Lenora, and her two granddaughters around 2009. (ECF No. 16-28 at 158–59.) After moving to Nevada, Hunter and Lenora's relationship deteriorated, and Hunter became frustrated and angry because Lenora

---

[1]The state corrections department's inmate locator page provides that Hunter is incarcerated at Northern Nevada Correctional Center. John Henley is the current warden for that facility. At the end of this Order, this Court kindly requests the Clerk of Court to substitute John Henley as a respondent for Respondent Isidro Baca. *See* Fed. R. Civ. P. 25(d).

[2]This Court previously dismissed grounds 1(a), 1(b), and 2. (ECF No. 64.)

[3]This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This summary is merely a backdrop to this Court's consideration of the issues presented in the Petition.

"stopped coming straight home from work[, s]he was sleeping all day[, and s]he wasn't taking care of the girls." (*Id*. at 161.) Lenora moved out of the Hunter residence with her daughters at one point, but Stella convinced Lenora to move back after Lenora had been abused by her boyfriend and after Stella found Lenora and her daughters living in a house with no electricity, heat, or food. (*Id*. at 162.) During this time, Stella and Hunter suspected that Lenora, who had struggled with drug addiction issues in Florida, was using methamphetamines. (*Id*. at 164, 208.)

On June 13, 2010, Stella was home with Hunter and their granddaughters. (*Id*. at 169.) When Lenora returned home from work that day, Lenora and Hunter, who had been drinking alcohol, got into an argument, leading to Hunter calling Lenora stupid in front of her daughters. (*Id*. at 170, 203.) Lenora told Stella that she was going to leave with the girls because she could not stand to live with Hunter anymore. (*Id*. at 179.) Stella tried to convince Lenora to stay and then told Hunter that Lenora was planning on leaving with the girls. (*Id*. at 182–83.) Hunter went to talk with Lenora and when he came back into the master bedroom where Stella had been waiting, he "walked really angrily into the closet," stated that he would "do the time," and came out with a gun in his hand. (*Id*. at 183–84.) Stella believed the gun was not loaded at the time Hunter retrieved it from the closet. (*Id*. at 185.)

Stella tried to block Hunter from leaving the room. (*Id*. at 184.) Hunter "shoved [Stella] and [Stella] shoved back, and then [Stella] got picked up and got thrown to the floor." (*Id*.) Stella got up, followed Hunter to the kitchen, and then saw Hunter and Lenora facing each other. (*Id*. at 190.) Stella then heard a pop, "saw smoke come up," and saw Lenora fall over. (*Id*. at 191.) While Stella attempted to give first aid to Lenora, who had been shot in her right upper chest, Hunter stayed "standing still in the same place with the gun in his hand." (*Id*. at 192, 194.) Lenora died

soon thereafter, and it was determined "that [the] firearm was . . . less than or equal to 16 inches from [Lenora] when it was fired." (ECF Nos. 17-1 at 21, 16-29 at 24.)

Stella testified that Hunter had told her on more than one occasion prior to the shooting that he hated Lenora. (ECF No. 16-28 at 205.) Moreover, after Stella told Hunter the night before the shooting that Lenora "was thinking about committing suicide," Hunter "said, [he] could help her out with that." (*Id.*)

At trial, Hunter argued that he was only guilty of manslaughter, not murder. (ECF No. 17-2 at 111.) According to Hunter's counsel's closing argument, Hunter "picked up the gun to scare some sense into Lenora. He did not pick that gun up with the intent to end Lenora's life." (*Id.*)

**B.    Procedural background**

A jury found Hunter guilty of second-degree murder with the use of a deadly weapon. (ECF No. 17-21.) Hunter was sentenced to 10 to 25 years in prison for the second-degree murder conviction plus a consecutive term of 57 to 147 months for the deadly weapon enhancement. (*Id.*) Hunter appealed, and the Nevada Supreme Court affirmed on April 11, 2012. (ECF No. 18-3.) Remittitur issued on May 8, 2012. (ECF No. 18-5.) Hunter petitioned for state postconviction review on August 30, 2012. (ECF No. 18-7.) After an evidentiary hearing, the state court denied Hunter postconviction relief on January 3, 2017. (ECF No. 19-7.) Hunter appealed, and the Nevada Court of Appeals affirmed on February 14, 2018. (ECF No. 19-22.) Remittitur issued on March 13, 2018. (ECF No. 19-23.)

Hunter filed his *pro se* federal habeas petition on April 19, 2018. (ECF No. 1-1.) Respondents moved to dismiss Hunter's *pro se* petition, and this Court granted the request, in part. (ECF No. 14, 22.) Hunter moved for a stay, and this Court granted the motion, administratively closing this action on December 9, 2019. (ECF No. 25.) On May 11, 2020, this Court reopened

this action and appointed counsel for Hunter. (ECF No. 30.) On November 9, 2020, this Court stayed this action at Hunter's request until he was ready to file his counseled amended petition. (ECF No. 35.) Hunter moved to reopen this action and filed his instant Petition on November 19, 2021. (ECF Nos. 39, 40.) In his Petition, Hunter raised the following grounds for relief:

> 1(a). His trial counsel failed to use Lenora's toxicology reports to argue her drug use caused erratic, violent, even suicidal behavior.
> 1(b). His trial counsel failed to elicit exculpatory testimony of Dustin Grate to present prior inconsistent statements from Stella.
> 1(c). His trial counsel failed to impeach Stella with her preliminary hearing testimony on whether the gun was loaded prior to retrieval.
> 1(d). His trial counsel failed to adequately investigate and prepare for sentencing.
> 2. The trial court erred in rejecting his proposed jury instructions.

(ECF No. 40.)

Respondents moved to dismiss the Petition, and Hunter again moved to stay this action. (ECF Nos. 49, 52.) This Court granted the stay. (ECF No. 54.) On July 20, 2023, this Court reopened this action. (ECF No. 57.) Respondents filed another motion to dismiss, Hunter responded, and Respondents replied. (ECF Nos. 58, 60, 63.) This Court granted the motion, in part, dismissing grounds 1(a) and 1(b) as procedurally defaulted and dismissing ground 2 as untimely. (ECF No. 64.)

Respondents answered the remaining grounds in the Petition, and Hunter replied. (ECF Nos. 67, 69.)

## II.  GOVERNING STANDARDS OF REVIEW

### A.  The Antiterrorism and Effective Death Penalty Act ("AEDPA")

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that

> was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted). The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing

5

*Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

### B. Ineffective assistance of counsel

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that counsel's "representation fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). This Court must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, as it did here, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id*. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010)

1 (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### III. DISCUSSION

#### A. Ground 1(c)—Counsel's failure to impeach Stella

In ground 1(c), Hunter alleges that his counsel failed to impeach Stella with her preliminary hearing testimony on whether the gun was loaded prior to Hunter's retrieval of it from the closet. (ECF No. 40 at 12.)

#### 1. Background information

At the preliminary hearing, during cross-examination, Stella testified as follows:

> Q. Now, did you know Leo to keep a gun loaded in the - - in your bedroom?
> A. No.
> Q. Did you see him load the gun?
> A. No.
> Q. Did you see him retrieve the gun?
> A. Yes.
> Q. Did you know it was loaded when he retrieved it?
> A. No.
> Q. Did he have any time to load the gun between the time he retrieved it and the time that the gun discharged?
> A. No. I don't think so.
> Q. So is it fair to say that the gun was loaded prior to - - if you know - - was prior - - the gun was loaded prior to the time that Leo picked it up?
> A. Yeah.
> Q. You understand the question? In other words, would you agree or dis - - would you agree the gun was loaded at the time Leo picked it up?
> A. Yeah, I assume it was loaded then.

(ECF No. 15-2 at 18–19.)

At Hunter's trial, Stella speculated that the gun was empty at the time Hunter retrieved it from the closet because it was placed "on the lowest shelf of [the] closet," and Hunter would not have left a loaded gun where their grandchildren could have reached it. (ECF No. 16-28 at 185.) Thus, Stella testified that Hunter "had to have loaded it" between retrieving it from the closet and confronting Lenora. (*Id.*) Stella then explained that the only time the gun had been stored in a loaded capacity was when they had issues with a wildcat, and then the loaded gun was stored "way up, up on top of the TV entertainment center." (*Id.*)

Later, during closing argument, the prosecutor made, *inter alia*, the following comment regarding the gun:

> The evidence is he went to his closet to get a gun. A gun that Stella said was not loaded. She knew it wasn't loaded, because it was at a level the children could reach and because she knew Mr. Hunter was safety conscious with firearms. . . . He didn't want the kids to get them. The only time she ever remembered a loaded gun, it was up on top of something that they couldn't reach. She knew that gun was not loaded for that reason. She said she didn't think it was loaded. So he must have loaded it when he went to get it.

(ECF No. 17-2 at 107–08.)

    **2.**    **State court determination**

In affirming the denial of Hunter's state postconviction petition, the Nevada Court of Appeals held:

> Hunter claimed trial counsel was ineffective for failing to present evidence the handgun he retrieved to scare his daughter was always loaded because it was used for protection against the coyotes that were present on his ranch. The district court conducted an evidentiary hearing and made the following findings. The defense plan at the *beginning* of the trial was for Hunter to testify in his own defense. Evidence the handgun was always loaded would have come in through Hunter's testimony. Hunter decided *during* the trial he did not wish to testify. And trial counsel cannot be said to have been ineffective for failing to present Hunter's testimony because Hunter decided during the trial he did not want to testify. We conclude the district court's factual findings are supported by substantial evidence and are not clearly wrong and the district court did not err in rejecting this claim. *See id*.

(ECF No. 19-22 at 3–4 (emphases in original).)

### 3. Analysis

Although Hunter's trial counsel could have sought to introduce Stella's preliminary hearing testimony to impeach her regarding the status of the gun, this Court is not persuaded that the trial court would have allowed such evidence if the prosecution had objected. Indeed, Stella's pertinent testimony at the preliminary hearing was speculative. Stella previously testified that she did not know whether the gun was loaded when Hunter retrieved it, she did not think he had time to load the gun after retrieving it, and she simply assumed the gun was loaded. This testimony amounts to mere speculation about the status of the gun. *See Lobato v. State*, 96 P.3d 765, 771 (Nev. 2004) (explaining that the trial court has "wide discretion to control cross-examination that attacks a witness's general credibility" and may restrict "those inquires which are repetitive, irrelevant, vague, [or] speculative"). Accordingly, this Court concludes that Hunter's trial counsel's actions did not fall outside the wide range of professionally competent assistance Stella's preliminary hearing testimony may not have been admissible because it was speculative. *See Strickland*, 466 U.S. at 681 ("[S]trategic choices must be respected . . . if they are based on professional judgment."). Applying these standards, the Court is not persuaded that any error that may have occurred was so serious that it deprived Hunter a fair trial, particularly when defense counsel elicited Stella's belief that Hunter did not intend to shoot Lenora when he obtained the gun.

However, even assuming there was basis for concluding that Hunter's trial counsel deficiently failed to impeach Stella, this Court finds that no prejudice resulted therefrom. Hunter alleges that impeaching Stella with her preliminary hearing testimony would have demonstrated that he lacked the malice element required for murder. (ECF No. 40 at 13.) If Hunter loaded the gun between his retrieval of it from the closet and confronting Lenora, his argument that the

shooting was accidental is undermined. Because Stella testified at the trial that Hunter had to have loaded the gun after retrieving it, her testimony was damaging to the defense. However, even if Hunter's trial counsel had cross-examined Stella about her preliminary hearing testimony, in which she testified that it was fair to say that the gun was already loaded at the time Hunter retrieved it, Hunter fails to demonstrate that there is a reasonable probability that the result of his trial would have been different.

During cross-examination, Hunter's trial counsel asked Stella if she had told detectives that the "gun was obtained for the purpose of scaring Lenora into not taking the children," and she responded, "I might have said it, because I thought the gun was unloaded." (ECF No. 16-28 at 223.) Hunter's trial counsel then clarified, "[b]ut you did not believe that there was intent for [Hunter] to shoot her when he retrieved the gun," and Stella responded, "[n]o." (*Id.*) Therefore, the defense was able to support their accidental defense argument by cross-examining Stella regarding her beliefs about Hunter's intent on the night of the shooting. As such, because Hunter's trial counsel presented evidence that Hunter did not have the intent to shoot Lenora, it is mere conjecture that the admission of Stella's speculative testimony at the preliminary hearing would have changed the jury's decision to find Hunter guilty of second-degree murder. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation."); *see also Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (concluding that the defendant's trial counsel "could have done a much better job of impeaching [the witness], . . . but the failures regarding impeachment of [the witness] are of comparatively little consequence").

Because Hunter fails to demonstrate prejudice under *Strickland*, he is not entitled to federal habeas relief for ground 1(c).

### B. Ground 1(d)—Counsel's failure to investigate and prepare for sentencing

In ground 1(d), Hunter alleges that his trial counsel failed to adequately investigate and prepare for sentencing. (ECF No. 40 at 14.) Specifically, Hunter contends that his trial counsel failed to investigate and present his history of post-traumatic stress disorder (PTSD) as a mitigating factor to his deadly weapon enhancement conviction. (*Id*.)

#### 1. Background information

At the sentencing hearing, Hunter's trial counsel did not present any evidence, but he did make the following arguments: (1) Hunter had no criminal history, (2) Hunter "lived an exemplary life," whereby he came from a "challenged background" and "was able to overcome that very humble beginning and . . . succeed[ ] to a great degree in the military," (3) he gave 20 years of his life "to the service of this country . . . at the risk of ultimately his own life," (4) the death of Lenora was "horribly tragic," (5) "Hunter realize[d] that he's responsible for what happened," (6) Hunter "spent a good part of Lenora's life attempting to steer her straight and to make her into a responsible person," and (7) Hunter's efforts on the night of the shooting "were geared towards protecting [his] grandchildren." (ECF No. 17-20 at 8–10.)

Regarding his mental health history, Hunter's Presentence Investigation Report noted the following:

> Mr. Hunter disclosed he has had definite thoughts of suicide, and expressed difficulty coping with the loss of friends in bombings during his military service. The defendant said his feelings would overcome him and he would park his vehicle in secluded areas and "cry to God." The defendant said he has been diagnosed with Post Traumatic Stress Disorder (PTSD) and Obsessive-Compulsive Disorder (OCD). The defendant said he is addressing his issues with "sobriety, prayer, meditation, relaxation, and ensuring he owns his part in this tragedy." In addition, Mr. Hunter would like medical assistance for his PTSD.

(ECF No. 21-1 at 5.)

During Hunter's postconviction proceedings, Thomas E. Bittker, M.D. testified that he conducted a forensic psychiatric assessment of Hunter on July 31, 2014. (ECF No. 18-29 at 6, 8–9.) Dr. Bittker testified, *inter alia*, to the following: (1) "Hunter grew up in a very chaotic home, a home that was marked by substantial physical and sexual abuse, the perpetrator being his biological father," (2) while stationed in Korea during his time in the Air Force, Hunter "witnessed a fire fight were three of his comrades were killed," (3) while stationed in Saudi Arabia during his time in the Air Force, Hunter "identified to his commanding officer the vulnerability of their particular facility to terrorist threats," but, after his concerns were dismissed, he was later "confronted by the news that a terrorist attack had occurred . . . exactly [at] the point that he had identified," resulting in feelings of guilt and helplessness, (4) Hunter "would retreat to substance abuse, couldn't sleep, had nightmares, all fairly classical signs of PTSD that, unfortunately, went unrecognized until he was incarcerated" in this case, (5) he diagnosed Hunter with "post traumatic stress disorder, alcohol dependence, persistent depressive disorder, [and] obsessive-compulsive disorder," (6) Hunter's PTSD made him more reactive, compromised his judgment, and limited his "capacity to assess the situation," (7) given Hunter's "service history and so on, [his] history of alcohol use, and the fact that he had been in the service for 22 years[, i]t would make sense for any defense counsel confronting a murder charge to . . . have explored those issues and . . . commissioned an independent psychiatrist to assess Mr. Hunter," (8) "[p]eople with PTSD don't make good decisions, particularly when they are in the midst of an anxiety-provoking episode such as what Mr. Hunter confronted," and (9) Hunter "was chronically a ticking time bomb because of his PTSD that remained untreated." (*Id.* at 13, 15–17, 22, 27–29, 50–51.)

Dr. Bittker concluded as follows:

> Regarding the issue of the instant offense and the contributions that his various psychiatric disorders had made to the instant offense, I concluded to a

12

>reasonable degree of medical certainty that the instant offense would not have occurred had the defendant not been alcohol dependent and under the influence of alcohol; would not have occurred had he not previously been programmed by multiple episodes of abuse victimization and abandonment as a child; would not have occurred had he not, on previous occasions, felt responsible for the death of others coincident to what he perceived to be either his insufficient advocacy or insufficient attention.
>	The offense did not spring from his intent to kill, but rather, Mr. Hunter's primary motivation was an attempt to protect his grandchildren whom the defendant believed was being victimized by his own daughter.
>	And given the absence of prior bad acts and conditions that I've outlined previously, I think the likelihood of reoffen[ding] is remote.

(*Id*. at 23–24.)

Hunter testified at the postconviction evidentiary hearing that he told his trial counsel "[s]omewhat" about his childhood traumas and "[t]o some degree" about the traumas he suffered while in the Air Force. (ECF No. 19 at 12, 20.)

In rejecting this claim on postconviction review, the state court held as follows:

>[T]his Court is unconvinced that if evidence of Petitioner's PTSD was presented to the court at sentencing the result would have been different. Counsel presented the court with mitigating evidence detailing Petitioner's troubled upbringing, extensive military career, lack of criminal history, and willingness to take responsibility. Petitioner—on the charge of second degree murder—received a definite sentence of twenty five (25) years, although the state recommended life in prison with the possibility of parole. On the weapon enhancement, Petitioner faced a possible sentence of one to twenty years, but received a sentence of fifty-seven (57) months to one hundred forty-four (144) months, far less than the maximum. Accordingly, this claim fails the second prong of *Strickland*.

(ECF No. 19-7 at 9–10.)

**2.	State court determination**

In affirming the denial of Hunter's state postconviction petition, the Nevada Court of Appeals held as follows:

>Hunter claimed trial counsel was ineffective at sentencing for failing to investigate and bring forth in mitigation evidence that he suffered from post-traumatic stress

13

disorder (PTSD). The district court conducted an evidentiary hearing and made the following findings. Trial counsel presented mitigating evidence at sentencing detailing Hunter's troubled upbringing, extensive military career, lack of criminal history, and willingness to take responsibility. Hunter was sentenced to a definite term of 25 years for second-degree murder despite the State's recommendation that he be sentenced to life with the possibility of parole. Hunter did not receive the maximum sentence for the deadly weapon enhancement. And Hunter failed to prove the outcome of the sentencing proceeding would have been different if trial counsel had presented evidence he suffered from PTSD. We conclude the district court's factual findings are supported by substantial evidence and are not clearly wrong and the district court did not err in rejecting this claim. *See Means v. State*, 120 Nev. 1001, 1012–13, 103 P.3d 25, 33 (2004) (petitioner bears the burden of proving ineffective assistance of counsel).

(ECF No. 19-22 at 3.)

### 3. Analysis

As previously stated, where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, as the state court did here, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Court accordingly concludes that the state courts were not unreasonable in finding that Hunter failed to establish deficient performance. At sentencing, counsel presented evidence of Hunter's troubled upbringing, extensive military career, lack of criminal history, and willingness to take responsibility. The state courts reasonably concluded that this did not fall outside the wide range of reasonable representation.

The state courts further reasonably concluded that Hunter failed to establish prejudice. First, although lacking the level of detail provided by Dr. Bittker, Hunter's Presentence Investigation Report alerted the state court that Hunter had been diagnosed with PTSD and experienced depression. (*See* ECF No. 21-1 at 5.) Second, the judge who sentenced Hunter was the same judge who denied Hunter postconviction relief, and, importantly, the judge indicated on postconviction review that he was unconvinced that Hunter's sentence would have been different if evidence of Hunter's PTSD had been presented to him. *See Washington v. Shinn*, 46 F.4th 915, 931 (9th Cir. 2022) ("We know that Washington's new evidence would not have made a difference because the sentencing judge said so."); *Cook v. Ryan*, 688 F.3d 598, 612 (9th Cir. 2012) (finding no prejudice where "the same trial judge who sentenced" the petitioner stated that the new evidence "would not have made any difference"). Third, in abstractly reweighing the evidence in aggravation against the new evidence in mitigation, it is far from clear that the new evidence in mitigation would have changed Hunter's sentence. *See Wiggins*, 539 U.S. at 534 ("In assessing prejudice, [this Court] reweigh[s] the evidence in aggravation against the totality of the available mitigating evidence."); *see also Wong v. Belmontes*, 558 U.S. 15, 27–28 (2009) ("It is hard to imagine expert testimony and additional facts about Belmontes' difficult childhood outweighing the facts of [the] murder."). Evidence of Hunter's PTSD and its effect on Hunter may have provided a better lens with which to view Hunter generally. However, this Court is not convinced that further evidence of Hunter's PTSD would have shifted the assessment that he deserved less than an intermediate sentence on his deadly weapon enhancement conviction. *See* Nev. Rev. Stat. 193.165(1) (stating that, in sentencing an individual for using a deadly weapon in the commission of a crime, the state court must consider, *inter alia*, "[a]ny mitigating factors presented by the person" and "[a]ny other relevant information"). Even though Hunter's PTSD likely made him

more reactive and compromised his judgment on the night Lenora was killed, Hunter still chose to obtain and then bring a loaded weapon into his verbal dispute with Lenora while his young grandchildren were watching. In assessing Hunter's penalty for using a deadly weapon, this aggravation evidence overshadows the mitigation evidence.

In sum, the Nevada Court of Appeals' determination that Hunter failed to demonstrate prejudice constituted an objectively reasonable application of *Strickland*. Hunter is not entitled to federal habeas relief for ground 1(d).

## IV.  CERTIFICATE OF APPEALABILITY

This is a final order adverse to Hunter. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability (COA). This Court has evaluated the claims within the Petition for suitability for the issuance of a COA. Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. *Id*.

Applying these standards, this Court finds that a COA is not warranted for ground 1(c) or ground 1(d).

## V. CONCLUSION[4]

IT IS THEREFORE ORDERED that the Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 **[ECF No. 40] is denied.**

IT IS FURTHER ORDERED that a **Certificate of Appealability is denied for ground 1(c) and ground 1(d).**

IT IS FURTHER ORDERED that the Clerk of Court (1) substitute John Henley for Respondent Isidro Baca, (2) enter Judgment accordingly, and (3) close this case.

Dated: August 26, 2024

_____
HOWARD D. MCKIBBEN
UNITED STATES DISTRICT JUDGE

---

[4] Hunter requests that this Court conduct an evidentiary hearing. (ECF No. 40 at 20.) Hunter fails to explain what evidence would be presented at an evidentiary hearing. Further, Hunter already had a postconviction evidentiary hearing at the state court. Hunter's request is denied.